UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

3ST RESEARCH LLC and JOHN K.
THOTTATHIL,

                  Plaintiffs,

    v.

ALBANY MOLECULAR RESEARCH,
INC.

                  Defendant.

Civil Action No. _____

**COMPLAINT AND JURY DEMAND**

Plaintiffs 3ST Research LLC ("3ST") and Dr. John K. Thottathil ("Dr. Thottathil"), by his undersigned attorneys, as and for his complaint against Albany Molecular Research, Inc. ("AMRI"), says:

### PARTIES

1.     3ST is a New Jersey Limited Liability Corporation having a principal place of business at 6 Kimball Circle, Westfield, NJ 07090.

2.     Dr. Thottathil is a citizen of the state of Illinois and resides at 28630 Skycrest Drive, Ivanhoe, IL 60060.

3.     Defendant Albany Molecular Research, Inc. ("AMRI") is a corporation formed under the laws of Delaware, with a principal place of business at 26 Corporate Circle, Albany, New York, 12203.

### JURISDICTION

4.     This Court has subject matter jurisdiction over this action as it concerns the Patent Laws, 35 U.S.C. et. seq.  Accordingly, this Court has federal question jurisdiction

over this action pursuant to 28 U.S.C. §§ 1338(a), (b).

5.    Supplemental jurisdiction over the state law claims is proper under 28 U.S.C. § 1367.

6.    This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the matter in controversy is between citizens of different States, and on information and belief, exceeds the sum or value of $75,000.00, exclusive of interest and costs.

## INTRODUCTION

7.    Dr. Thottathil invented a technology that delays onset of the effects of certain pain-relieving drugs in order to discourage  use of the drugs by addicts who may be seeking a euphoric "high".  Dr. Thottathil brought his inventions to Waterville Valley Technologies ("WVT"), which then entered into a contract with AMRI to test the technology.  AMRI's testing, on behalf of WVT, indicated that many aspects of Dr. Thottathil's invention were very valuable, and the Patent Office has indicated that a number of aspects of Dr. Thottathil's technology are patentable.  Recognizing the great potential of Dr. Thottathil's inventions, first WVT and then AMRI, converted Dr. Thottathil's property rights in his inventions.  Dr. Thottathil has settled his dispute with WVT and WVT's Chief Executive Officer (CEO).  This suit is to remedy the damage to Dr. Thottathil and to his assignee of the rights to his technology, 3ST, caused by AMRI and to correct inventorship and ownership claimed by AMRI on Dr. Thottathil's pending patent applications.

## FACTUAL BACKGROUND

8.    Dr. Thottathil is the inventor of a prodrug technology related to the opioid

drugs known as oxycodone and oxymorphone, as well as other compounds ("Thottathil Prodrug Technology").

9.      A prodrug is a medication or compound that, after administration, is metabolized or converted within the body to a pharmacologically active drug, in this case either oxycodone or oxymorphone.

10.     Optimal pain management requires the selection of analgesic drugs that achieve pain relief with minimal side effects.

11.     Standard opioid analgesics, such as oxycodone and oxymorphone, have provided very important options for treatment of pain related to cancer, trauma, and other serious medical conditions..

12.     However, because oxycodone and oxymorphone both provide rapid onset of their effects, including drug-related euphoria, these drugs are frequent targets of abuse, and together with other opioids, such misuse is commonly believed to comprise both a medical and social crisis in the U.S. and other countries..

13.     The Thottathil Prodrug Technology delays the immediate euphoria that drug abusers strongly seek, thereby reducing preference by abusers and addicts for these compounds, and  therefore this technology offers a major breakthrough to deter such abuse.

14.     By slowing onset of effects, thereby discouraging incentives for abuse, the Thottathil Prodrug Technology also protects patients and abusers from accidental and intentional overdose, misuse, and abuse that is associated with disruption of the dosing form, which can typically be achieved with unprotected drugs whose active ingredient can be released by crushing the tablets into powders that can be snorted intranasally, mixed with alcoholic beverages, or solubilized to facilitate intravenous injection.

3

15.     AMRI is a contract research and manufacturing company, which among other activities provides services to third parties that are seeking to commercialize pharmaceuticals.

16.     In 2010, Dr. Thottathil had sought financing to commercialize the Thottathil Prodrug Technology.

17.     During that year, Dr. Thottathil met James Peltier, CEO of WVT, and eventually began a contractual relationship with Peltier's corporation, WVT.

18.     As the inventor of Thottathil Prodrug Technology, Dr. Thottathil explicitly retained his inventorship and ownership rights over the technology, and in exchange for partial ownership rights to a new oxymorphone derivative that would be made using Thottathil Prodrug Technology, WVT agreed to assist Dr. Thottathil in acquiring funding to develop and commercialize his technology.

19.     As part of the attempt to commercialize the technology, WVT contracted with AMRI to conduct laboratory research, testing, and development under the supervision of Dr. Thottathil.

20.     Upon information and belief, the terms of the contract between WVT and AMRI provided for WVT and Dr. Thottathil to retain their ownership and inventorship rights in all intellectual property.

21.     Upon information and belief, the terms of the contract between WVT and AMRI provided for any and all intellectual property rights that may have been acquired by AMRI, or by its employees, to be assigned to WVT.

22.     Dr. Thottathil's agreement with WVT provided Dr. Thottathil with a financial stake in WVT in exchange for a share of his ownership in oxymorphone

derivatives created using the Thottathil Prodrug Technology.

23.    The agreement between Dr. Thottathil and WVT gave Dr. Thottathil the right to supervise and control the development and commercialization of Thottathil Prodrug Technology.

24.    The agreement between Dr. Thottathil and WVT permitted WVT to use Thottathil Prodrug Technology solely with respect to a single drug, oxymorphone. Development efforts directed to oxycodone or any other compounds were specifically not permitted.  No licenses to any other compounds related to Thottathil Prodrug Technology, pursuant to grant or other disposition of knowhow or rights, were ever permitted, including but not limited to research, testing, development, manufacturing or commercialization.

25.    AMRI was aware of the agreement between Dr. Thottathil and WVT.

26.    AMRI was aware that Dr. Thottathil was the sole inventor and owner of the Thottathil Prodrug Technology.

27.    AMRI was aware that Dr. Thottathil had a financial and ownership interest in WVT's efforts to develop and commercialize the Thottathil Prodrug Technology for oxymorphone.

28.    AMRI was aware that Dr. Thottathil had not assigned his inventorship interest to WVT.

29.    AMRI was aware that Dr. Thottathil and WVT had agreed that Dr. Thottathil would supervise and control the development and commercialization of oxymorphone that used the Thottathil Prodrug Technology.

30.    AMRI was aware that WVT was only permitted to apply the Thottathil Prodrug Technology to a single compound, oxymorphone.

31.     In 2014, AMRI began working on the Thottathil Prodrug Technology on a contract basis with WVT.

32.     In 2014, prior to the start of the work at AMRI, Dr. Thottathil gave two confidential PowerPoint presentations to AMRI scientists and to AMRI senior management that explained the Thottathil Prodrug Technology, including classes of compounds, specific compounds, and specifics of executing the technology in the laboratory.  The confidential presentations included information related to oxymorphone as well as oxycodone derivatives.

33.     During one of the presentations by Dr. Thottathil at AMRI, which was attended by AMRI scientists, AMRI senior management, and the WVT CEO (Mr. James Peltier), Mr. Peltier publicly stated that "the prodrug technology, invention and know-how belong to Thottathil" and that he (Peltier) "is only a businessman."

34.     Starting in October or November 2014, Dr. Thottathil traveled frequently to AMRI from his home in Chicago, IL, staying near AMRI's corporate and research location n Albany, NY for weeks at a time, in order to work in AMRI's laboratory to oversee and direct the work performed by   contracted AMRI scientists on oxymorphone drug candidates.

35.     During Dr. Thottathil's stays at Albany-AMRI, he shared laboratory space, conducted and directed the ongoing research side-by-side with AMRI scientists, and recorded his work in a laboratory notebook.  The laboratory notebook is currently held by AMRI.

36.     During Dr. Thottathil's stays at Albany-AMRI, he had daily scientific meetings and debriefings in the form of group meetings with AMRI scientists who were

6

working on the Thottathil Prodrug Technology. During these meetings, Dr. Thottathil routinely provided direction to AMRI scientists that advanced the oxymorphone project.

37.      During the weeks when Dr. Thottathil was not staying at Albany-AMRI, Dr. Thottathil had weekly scientific teleconferences with the AMRI scientists.  During these meetings, he routinely provided further direction that advanced the oxymorphone project.

38.      Dr. Thottathil disclosed to AMR and to WVT many oxymorphone prodrug candidates based on his invention of Thottathil Prodrug Technology, and he disclosed methods to synthesize these compounds.  Under Dr. Thottathil's leadership and direction, the oxymorphone prodrug candidates were developed, prepared, and synthesized at AMRI.

39.      No other activities related to research, application or use of Thottathil Prodrug Technology was authorized or allowed by Dr. Thottathil, including any work related to oxycodone.

40.      However, in February 2015 while Dr. Thottathil was out of the country, upon information and belief, AMRI, WVT and Peltier secretly initiated a second project based on the application of Thottathil Prodrug Technology to oxycodone, without having any prior discussion with, notice to, authorization or agreement by Dr. Thottathil.  AMRI thus knowingly assisted WVT in violating key terms of the WVT-Thottathil contract.

41.      AMRI participated in this secret second project related to oxycodone, and continued work on the project related to oxymorphone, but actively barred and excluded Dr. Thottathil from these activities, despite knowing that Dr. Thottathil was the inventor and owner of the technology, despite knowing that WVT had no rights to pursue either the oxycodone or the oxymorphone projects without Dr. Thottathil's consent, which was not

given, and despite knowing that WVT had no rights to pursue the oxymorphone project without Dr. Tottathil's oversight and participation.

42.     In or around April/May 2015, AMRI entered into additional agreements with WVT to continue development of oxymorphone and oxycodone products based on Dr. Thottathil's Prodrug Technology.

43.     As part of this arrangement with WVT, AMRI agreed to keep the additional work secret from Dr. Thottathil.

44.     AMRI was aware that by keeping the additional work secret from Dr. Thottathil, it was utilizing Dr. Thottathil's intellectual property without Dr. Thottathil's permission, and actively excluding Dr. Thottathil from advancing his own inventions.

45.     While working with AMRI, before being excluded, Dr. Thottathil continued to provide AMRI with additional ideas, inventions, chemical structures of potential prodrug candidate compounds, technical ideas, and other confidential information.

46.     During this period, Dr. Thottathil continued to provide to and share with AMRI's scientists confidential  test results of the prodrug candidates that had been prepared at AMRI under his direction, but that had been conducted in animals by non-AMRI contractors who were still overseen by Dr. Thottathil, thus disclosing to AMRI valuable confidential information that demonstrated both the activity of these drugs as well as their pharmacologic distribution and usefulness, thereby showing to AMRI their great commercial potential.

47.     Starting in November 2015, as a result of AMRI and WVT's actions, Dr. Thottathil had been totally excluded from information regarding research work, data, results, status, progress reports and discussions regarding the development of the Thottathil

8

Prodrug Technology at AMRI.

48. As a result of AMRI's actions, Dr. Thottathil was prevented from overseeing the research, development and manufacturing of the products that are based on Thottathil Prodrug Technology.

49. Once Dr. Thottathil had been excluded from working on his own inventions, AMRI and WVT continued to develop Dr. Thottathil's technology.

50. WVT and AMRI then proceeded to file patent applications on compounds made by Dr. Thottathil in the AMRI laboratory and using Thottathil Prodrug Technology.

51. In February 2015, WVT's CEO sent an email to a patent attorney, introducing Dr. Thottathil as "the innovator of the chemistry we are developing", noting that WVT was "working on Oxymorphone and Oxycodone prodrugs." (See Exhibit A.)

52. In April 2015, WVT filed a patent application for the Thottathil Prodrug Technology ("Waterville Provisional Application"). Dr. Thottathil and WVT's CEO (James Peltier), were listed as inventors on the Waterville Provisional Application. According to Exhibit A, Mr. Peltier should not have been named an inventor on the Waterville Provisional Application. The filing of this patent application was kept secret from Dr. Thottathil but, upon information and belief, the patent had been drafted in part with the active participation of AMRI employees.

53. In April 2016, as a direct followup to the Waterville Provisional Application, WVT proceeded to file a follow-on Non-Provisional Patent Application ("Waterville Non-Provisional Application") that claimed priority to, and was based directly upon, the Waterville Provisional Application. WVT and AMRI named their employees as inventors on the Waterville Non-Provisional Patent Application, but Dr.

Thottathil was now excluded as an inventor by AMRI and WVT.

54.     According to Exhibit A, Dr. Thottathil was the inventor of the technology. The WVT and AMRI employees that were named as inventors were not inventors of the inventions claimed in the Waterville Non-Provisional Application.

55.     As part of the Waterville Non-Provisional Application, AMRI employees assigned their interests to WVT.

56.     Having become aware of litigation filed in this matter by Dr. Thottathil against WVT, in January 2017 AMRI also filed suit against Waterville in order to rescind the assignment by its employees to WVT, thereby attempting to claim ownership of property that rightfully belongs to Dr. Thottathil.  Dr. Thottathil believes he is the sole inventor of the claims in the Waterville Non-Provisional Application.  Solely by way of example, even assuming that certain AMRI scientists contributed to minor aspects of inventions disclosed in the Waterville Non-Provisional Application, AMRI is wrongfully seeking to enrich itself by assuming joint ownership with WVT of inventions made solely by Dr. Thottathil that were fraudulently claimed in the Waterville Non-Provisional Application.  This is because a named inventor, even of a minor aspect of an invention, receives a joint ownership position in the Waterville Non-Provisional Application, which did not list Dr. Thottathil as an inventor.

57.     In February 2017, again having then become aware of Dr. Thottathil's litigation against WVT, AMRI then proceeded to file two patent applications based on the Waterville Non-Provisional Application (the "AMRI Continuation Applications").

58.     Upon information and belief, and only after learning of Dr. Thottathil's lawsuit against WVT and James Peltier, AMRI then proceeded to add Dr. Thottathil's name

10

as an inventor onto these AMRI Continuing Applications, but without informing him of this action, nor obtaining his input, or seeking his consent to use his name or to file either of these Applications.

59.     AMRI also named their own employees as co-inventors on the AMRI Continuation Applications.  Upon information and belief, AMRI employees named as inventors on the AMRI Continuation Applications were not inventors of any inventions claimed in the AMRI Continuation Applications.

60.     Upon information and belief, AMRI named their employees as inventors, as well as rescinded their prior assignment of the patents to WVT, so that AMRI would have joint ownership rights in Dr. Thottathil's invention and could directly profit from their commercialization.

61.     Upon information and belief, the actions AMRI took to exclude Dr. Thottathil were undertaken as a result of the substantial commercial value AMRI had learned and recognized in the Thottathil Prodrug Technology.

62.     In a further effort to gain an ownership interest in the Waterville Application and the Thottathil Prodrug Technology, AMRI filed suit against WVT in January 2017 ("AMRI Collection Lawsuit").

63.     The AMRI Collection Lawsuit claims that WVT failed to remit to AMRI certain of its outstanding bills, and therefore sought rescission of patent assignments by AMRI scientists on the basis of a payables dispute.  Effectively, absent such assignment after rescission, AMRI inventors – and pursuant to prior employee agreements made by all the scientists that ceded all such ownership to AMRI – AMRI would then be co-owner of the patents and the Waterville Application, as well as an owner of  the Thottathil Prodrug

Technology.

64.     Aware that WVT might not be financially able to defend against the AMRI Collection Lawsuit, AMRI has continued to pursue the Collection Lawsuit, and is seeking a default judgment against WVT, as well as an order from the Court in the matter that would award AMRI exclusive ownership of the Waterville Application.

65.     Collectively, by repeatedly undertaking actions that excluded Dr. Thottathil from the project, including the actions undertaken in 2017 to exclude Dr. Thottathil from deliberation or consent regarding his addition as new inventor to AMRI Continuing Applications, as well as actions that allowed its employees to assign rights to WVT for a patent application that did not list Dr. Thottathil as an inventor, that filed the Collection Lawsuit that seeks exclusive ownership of the Waterville Application, and that filed the patent continuations that wrongfully included AMRI employees on a patent that makes claims for compounds that were exclusively invented by Dr. Thottathil, AMRI has clearly shown that it is fraudulently attempting to gain ownership in technology that was invented exclusively by Dr. Thottathil.

66.     Even partial ownership of a patent is significant, as the invention cannot be protected from infringement unless all owners are in agreement.  Thus, Dr. Thottathil loses exclusive rights to control his property.

67.     If successful, AMRI's attempt to gain even a partial ownership interest in Dr. Thottathil's inventions would have the impact of substantially negating the value of the technology to Dr. Thottathil.

68.     As the exclusive inventor of the Thottathil Prodrug Technology, Dr. Thottathil should be the exclusive owner of the related patents, but he is not because of

AMRI's fraudulent actions.

69.     As a result of AMRI's conduct, statements, and omissions, the commercialization of the Thottathil Prodrug Technology has been significantly delayed, which in the pharmaceutical industry represents very substantial monetary losses.

70.     AMRI's actions described herein were intentional, willful, reckless, fraudulent and egregious.

71.     Dr. Thottathil has assigned to 3ST all of his rights in his Prodrug Technology and in all of the patents and patent applications that issue or are filed based on his Prodrug Technology, including his rights in the Waterville Provisional Application, the Waterville Non-Provisional Application and in the AMRI Continuation Applications.

72.     3ST has therefore been harmed by AMRI.

## COUNT I
## CONVERSION BY AMRI OF PLAINTIFFS' PROPERTY RIGHTS IN THE AMRI CONTINUATION APPLICATIONS

73.     Dr. Thottathil repeats and re-alleges the allegations of the paragraphs above as if fully set forth here.

74.     Upon information and belief, Dr. Thottathil is the sole inventor of the subject matter disclosed and claimed in the AMRI Continuation Applications, or, alternatively, invented the vast majority of the subject matter disclosed and claimed therein.

75.     Under the Patent Laws of the United States, each named inventor is a joint owner of a patent or a patent application, absent any other agreement or assignment.

76.     Despite the fact that AMRI's employees did not materially contribute to the conception of the inventions claimed in the AMRI Continuation Applications, AMRI included their employees as inventors on the AMRI Continuation Applications, thereby

taking joint ownership over Thottathil's inventions.

77.     By virtue of Dr. Thottathil's sole inventorship of most or all of the subject matter disclosed and claimed in the AMRI Continuation Applications, Dr. Thottathil should have been the sole inventor named in the AMRI Continuation Applications, but he was never notified of AMRI's use of his name.  Dr. Thottathil should have the right to exclusive ownership over most, if not all, claims, compounds, processes, methods and technology contained therein.

78.     ARMI's conduct in naming its employees as co-inventors with Dr. Thottathil deprived Dr. Thottathil of his exclusive ownership rights of the subject matter claimed in the ARMI Continuation Applications, and therefore AMRI again intentionally interfered with Dr. Thottathil's ownership interest in the Thottathil Prodrug Technology.

79.     AMRI intentionally interfered with Dr. Thottathil's ownership interests in the AMRI Continuation Applications.

80.     AMRI's actions in interfering with Dr. Thottathil's property interests have caused, and continue to cause, significant financial harm to Dr. Thottathil.

## COUNT II
## CONVERSION BY AMRI OF PLAINTIFFS' PROPERTY RIGHTS IN THE WATERVILLE NON-PROVISIONAL APPLICATIONS

81.     Dr. Thottathil repeats and re-alleges the allegations of the paragraphs above as if fully set forth here.

82.     Upon information and belief, Dr. Thottathil is the sole inventor of the subject matter disclosed and claimed in the Waterville Non-Provisional Application, or, alternatively, he invented the vast majority of the subject matter disclosed and claimed therein.

14

83.     Under the Patent Laws of the United States, each named inventor is a joint owner of a patent or a patent application, absent any other agreement.

84.     Despite the fact that AMRI's employees did not contribute to the conception of the inventions claimed in the Waterville Non-Provisional Application, AMRI included their employees as inventors on the Waterville Non-Provisional Application, thereby taking joint ownership over Thottathil's inventions.

85.     By virtue of Dr. Thottathil's sole inventorship of most or all of the subject matter disclosed and claimed in the Waterville Non-Provisional Application, Dr. Thottathil should have been the sole inventor named in the Waterville Non-Provisional Application, and Dr. Thottathil should have the right to exclusive ownership over most, if not all, claims, compounds, processes, methods and technology contained therein.

86.     ARMI's conduct in naming its employees as co-inventors with Dr. Thottathil, in having those inventors assign their rights to AMRI, and in suing WVT for ownership of the Waterville Non-Provisional Application, deprived Dr. Thottathil of his exclusive ownership rights of the subject matter claimed therein, and therefore AMRI intentionally interfered with Dr. Thottathil's ownership interest in the Thottathil Prodrug Technology.

87.     AMRI intentionally interfered with Dr. Thottathil's ownership interests in the Waterville Non-Provisional Application.

88.     AMRI's actions in interfering with Dr. Thottathil's property interests have caused, and continue to cause, significant financial damage to Dr. Thottathil.

<u>**COUNT III**</u>
**TORTIOUS INTERFERENCE BY AMRI WITH PROSPECTIVE ECONOMIC
ADVANTAGE**

89.    Dr. Thottathil repeats and re-alleges the allegations of the paragraphs above as if fully set forth here.

90.    The Thottathil Prodrug Technology is applicable to a number of compounds, and WVT and AMRI, by virtue of its contract with WVT, only had rights to develop one specific compound, oxymorphone.  Thottathil had, and continues to have, plans to further develop his technology with respect to a number of compounds.

91.    As the Thottathil Prodrug Technology continued to be developed under his guidance prior to becoming commercialized, Dr. Thottathil had a reasonable expectation of entering into business relationships with numerous third parties with respect to his technology, including, but limited to, pharmaceutical companies, investors, and venture capitalists, and other financial partners that could participate in developing and commercializing this technology.

92.    As the Thottathil Prodrug Technology continued to be developed under his guidance prior to being commercialized, Dr. Thottathil had a reasonable expectation of entering into licensing agreements with pharmaceutical companies and other partners to produce and sell his inventions.

93.    Evidenced by the fact that AMRI regularly performs development work for inventors of pharmaceuticals, AMRI was aware of the expectation that Dr. Thottathil would enter into additional beneficial business relationships with third parties.  AMRI was also aware that Dr. Thottathil had only granted a very limited development right to WVT.

94.    ARMI and WVT knowingly and deliberately used Dr. Thottathil's

16

technology in non-permitted areas to which they were not entitled.  Further, AMRI participated with WVT in barring and excluding Dr. Thottathil from his own project. AMRI was aware that it was interfering with Dr. Thottathil's' expectation of entering into additional beneficial business relationships with third-parties.

95.     AMRI was aware that if it gained a partial or exclusive ownership interest in the Thottathil Prodrug Technology, Waterville Non-Provisional Application, and/or the AMRI Continuation Applications, Dr. Thottathil's ability to enter into additional beneficial business relationships with third parties along with attendant personal financial benefits would be significantly damaged or reduced.

96.     AMRI's conduct in freezing Dr. Thottathil out of his project, working in non-permitted areas relating to Thottathil Prodrug technology, seeking ownership of the Waterville Non-Provisional Application, and the filing of the AMRI Continuation Applications on behalf of AMRI and its employees were intentional and unjustified interferences that have the effect of preventing Dr. Thottathil from entering into additional beneficial business relationships with third-parties.

97.     As a result of AMRI's intentional interference, commercialization of the Thottathil Prodrug Technology has been substantially delayed, the value of these assets has been substantially diminished and continues to waste, and Dr. Thottathil has suffered, and continues to suffer, significant financial damages.

## <u>COUNT IV</u>
## TORTIOUS INTERFERENCE WITH BUSINESS CONTRACTS

98.     Dr. Thottathil repeats and re-alleges the allegations of the paragraphs above as if fully set forth here.

99.     As detailed above, Dr. Thottathil and WVT had a valid contact, pursuant to

which Dr. Thottathil had a financial interest in the project to solely develop and commercialize the Thottathil Prodrug Technology limited to the single drug, oxymorphone. The contract did not permit work to be done on any compound other than oxymorphone.

100. Under that contract, Dr. Thottathil was to control, supervise, and direct the work being performed by AMRI and WVT on oxymorphone, and no other work was authorized.

101. Under that contract, Dr. Thottathil retained his full ownership interest in all other inventions related to the Thottathil Prodrug Technology.

102. Under that contract, Dr. Thottathil would be listed as an inventor and have an ownership interest in any patent filed as a result of the commercialization work.

103. AMRI was aware of the contract between Dr. Thottathil and WVT, and AMRI was aware of key terms of that contract.

104. AMRI interfered with the contract by cooperating with WVT to exclude Dr. Thottathil from the project to commercialize his technology by preventing Dr. Thottathil from having access to the project and the project information, and also by working on compounds other than oxymorphone.

105. AMRI, together with its employees, interfered with the contract between WVT and Dr. Thottathil by working to exclude Dr. Thottathil from the Waterville Application, and also by assigning rights to WVT for a patent that did not include Dr. Thottathil.

106. As a result of AMRI's statements, actions, omissions, and acquiescence, WVT breached its contract with Dr. Thottathil.

107.   As a result of AMRI's interference with the contract between WVT and Dr. Thottathil, Dr. Thottathil suffered, and continues to suffer, significant financial harm.

**COUNT V**
**DECLARATION OF INVENTORSHIP FOR AMRI CONTINUATION APPLICATIONS**

108.   Dr. Thottathil repeats and re-alleges the allegations of the paragraphs above as if fully set forth here.

109.   Upon information and belief, the claims, compounds, processes, and methods contained in the AMRI Continuation Applications were invented exclusively by Dr. Thottathil.

110.   The AMRI Continuation Applications incorrectly list AMRI employees as inventors.

111.   Dr. Thottathil is the sole "inventor" pursuant to 35 U.S.C. et. seq. for the AMRI Continuation Applications and this Court should order the correction of inventorship on those continuations.

**COUNT VI**
**DECLARATION OF INVENTORSHIP ON WATERVILLE NON-PROVISIONAL APPLICATION**

112.   Dr. Thottathil repeats and re-alleges the allegations of the paragraphs above as if fully set forth here.

113.   The claims, compounds, processes, and methods contained in the Waterville Non-Provisional Application were invented exclusively by Dr. Thottathil.

114.   The Waterville Non-Provisional Application incorrectly lists AMRI employees as inventors.

115.   Dr. Thottathil is the sole "inventor" pursuant to 35 U.S.C. et. seq. for the

Waterville Non-Provisional Application and this Court should order the correction of inventorship on this application.

WHEREFORE, Plaintiffs 3ST and Dr. Thottathil demands judgment in their favor and against Defendant Albany Molecular Research, Inc. as follows:

A.      All actual damages;

B.      Consequential damages;

C.      Punitive damages;

D.      A declaration that Dr. Thottathil is the sole inventor of the claims, compounds, processes, methods and technology contained in the Waterville Non-Provisional Application and AMRI Continuation Applications;

E.      In the event that the Court, or Dr. Thottathil together with AMRI, agree that one or more AMRI employees contributed inventive steps to Dr. Thottathil's patent and should remain as inventors, AMRI will promptly and fully cooperate with Dr. Thottathil in amending the patent filings and shall irrevocably and fully assign all interest and ownership of Dr. Thottathil's patents, whether of behalf or AMRI and its employees, to Dr. Thottathil.

F.      Prompt and complete provision to Dr. Thottathil of all laboratory results, defined as including but not being limited to notebooks, reports, and data including but not limited to electronic data, that document all of the research activity that was conducted at AMRI by Dr. Thottathil, as well as all laboratory results of work conducted by AMRI scientists on Thottathil Prodrug Technology, including but not limited to those notebooks used by Dr. Thottathil as well as by AMRI scientists before Dr. Thottathil had been excluded by AMRI, along with all reports and data including but not limited to electronic data.

G.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Dr. Thottathil requests trial by jury on all issues triable at law.

Dated: July 31, 2017

Respectfully submitted,

/s/Glen M. Diehl
Glen M. Diehl, Esq.
DIEHL LAW LLC
20 Shawnee Drive
Suite B
Watchung, NJ 07059
Attorneys for Plaintiff

## CERTIFICATION UNDER LOCAL RULE 201.1(d)(3)

I certify that the damages recoverable in this action exceed the sum of $150,000

exclusive of interest and costs and any claim for punitive damages.

Dated: July 31, 2017

Respectfully submitted,

/s/Glen M. Diehl
Glen M. Diehl, Esq.
DIEHL LAW LLC
20 Shawnee Drive
Suite B
Watchung, NJ 07059
Attorneys for Plaintiff